1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

10

11  JOSE J. HERNANDEZ,                      )   1:10-cv-00391-LJO-JLT HC
                                            )
12          Petitioner,                     )   FINDINGS AND RECOMMENDATIONS
                                            )   TO DENY PETITION FOR WRIT OF
13      v.                                  )   HABEAS CORPUS  (Doc. 1)
                                            )
14  NEW FOLSOM STATE PRISON                 )   ORDER DIRECTING THAT OBJECTIONS BE
    WARDEN,                                 )   FILED WITHIN TWENTY DAYS
15                                          )
            Respondent.                     )
16  _____)

17

18          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

19  pursuant to 28 U.S.C. § 2254.

20                              **PROCEDURAL HISTORY**

21          Petitioner is in custody of the California Department of Corrections and Rehabilitation

22  ("CDCR") serving a sentence of life without the possibility of parole[1] pursuant to a September 26,

23  2007 judgment of the Superior Court of California, County of Tulare (the "Superior Court"), for the

24  following convictions: (1) first degree felony murder with a robbery/burglary special circumstance

25  (Cal. Pen. Code § 187(a)); (2) attempted murder of a peace officer, with a special allegation that the

26

27          [1]The life sentence without the possibility of parole was for the first degree felony murder conviction. Petitioner was
    also sentenced to life with the possibility of parole for the attempted murder conviction as well as an aggregate determinate
28  term of 22 years for the remaining counts. (LD 4, p. 3).

offense occurred while the officer was engaged in the performance of his duties (Cal. Pen. Code §§ 187, 664(e)); (3) four counts of second degree robbery with personal use of a firearm (Cal. Pen. Code § 211); (4) three counts of second degree commercial burglary (Cal. Pen. Code § 459); (5) conspiracy to commit robbery (Cal. Pen. Code § 182(a)(1)); (6) unlawfully taking or driving a vehicle (Cal. Veh. Code § 10851(a); and (7) receiving a stolen vehicle (Cal. Pen. Code § 496(a). (Doc. 20, Lodged Documents ("LD") 4, p. 3).

Petitioner subsequently filed a direct appeal in the California Court of Appeals, Fifth Appellate District ("5th DCA"), which, in an unpublished decision, struck a special allegation connected to the attempted murder conviction due to instructional error, vacated the trial court's sentence of life with the possibility of parole, and affirmed Petitioner's conviction in all other respects. (LD 4).   Subsequently, Petitioner filed a petition for review in the California Supreme Court, which was denied on September 15, 2009.  (LD 6).

On February 25, 2010, Petitioner filed the instant petition.  (Doc. 1). Respondent's answer was filed on May 20, 2010.   (Doc. 19).  On June 30, 2010, Petitioner filed his Traverse.  (Doc. 23).

Respondent concedes that all grounds for relief in the petition have been fully exhausted. (Doc. 19, p. 7).

## FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision:

May 14, 2002–Robbery/Burglary of Fashion For All (Counts 9 & 10)

On May 14, 2002, Maria Toscano was working at Fashion For All, a clothing store in Porterville.  She was helping Patricia Briseno and her sisters pick out prom dresses.  Two men walked into the store and looked at shirts.  Briseno thought it was strange to have men in a store that primarily carried party clothes for young women.

The two men walked to the counter and indicated they were going to buy a shirt.  Toscano opened the register and one man produced a black semiautomatic handgun and pointed it at her.  Toscano was frightened, and she raised her arms and screamed.  She told the gunman to take all the money.  The other man lifted his shirt and revealed he also had a black semiautomatic handgun.  Briseno, who was in the dressing room, heard Toscano scream and walked out of the dressing room.  Briseno saw the men pointing guns at Toscano and taking money out of the register.  The two men left the store with the money.

Toscano described one gunman as Hispanic, between 20 to 25 years old, with a thin build, wearing a black baseball cap and gray baggy pants.  The other gunman was white, in his 20's, with a medium build and blue eyes, and he was wearing a long-sleeve blue and white plaid

1   shirt, and blue pants with the leg cuffs rolled up.

2   Toscano and Briseno were separately shown photographic lineups which included pictures of
    Landois and defendant.  Toscano picked out Landois as possibly one of the gunman, but said
3   he looked thinner in person than in the photograph.  Briseno selected Landois as strongly
    looking like one of the gunmen.  Both Toscano and Briseno positively identified defendant as
4   the other gunman, and Briseno described defendant as the gunman with the blue eyes.

5   Based on this incident, defendant was charged and convicted of count 9, second degree
    robbery of Toscano and Fashion For All [ ], with the special allegation that he personally
6   used a firearm [ ]; and count 10, second degree commercial burglary of Fashion For All [ ].[2]

7   May 16, 2002–The Stolen Dodge Van (Counts 11 & 12)

8   On the morning of May 16, 2002, Aurelio Ramos drove his 1987 gray Dodge van to work
    and parked at the government plaza in Visalia.  When he left for lunch, he discovered his van
9   had been stolen from the parking lot.

10  Just after 11:00 a.m., Jeff Jones and his wife were pulling into the Bank of Sierra parking lot
    in Visalia.  A gray Dodge van was also in the bank's parking lot.  Jones saw two men in the
11  van; one man was wearing women's clothing and a blonde wig.  The van kept pulling in and
    out of a parking space, it backed into someone else's vehicle, and it drove away.  Jones
12  followed the van, obtained the license plate number, took a picture of the vehicle with his
    digital camera, and lost the van in traffic.
13
    Later that day, Ramos reviewed Jones's photograph and identified the vehicle as his stolen
14  van.  As we will discuss post, Landois was seen walking from that van about an hour later,
    shortly before a robbery, defendant was seen driving that van immediately after a robbery,
15  and defendant was arrested the next day in possession of the van.

16  Defendant was charged and convicted of count 11, unlawfully taking or driving Ramos's van
    [ ], and count 12, receiving a stolen vehicle, the van [ ].
17
    May 16, 2002–Robbery/Burglary of Clothestime (Counts 5 & 7)
18
    The primary incident in this case occurred at a shopping center located near Highway 198 in
19  Visalia, shortly after Ramos's van was stolen, and began with simultaneous robberies
    committed by defendant and Landois at two adjacent clothing stores: Clothestime and Susie's
20  Deals (Susie's).

21  The shopping center consists of Vons, Longs, several restaurants and other stores.  Susie's
    and Clothestime are located next to each other, between Vons and Longs, and a sidewalk runs
22  in front of the stores and borders the parking lot.  Carl's Jr. and Arby's restaurants are located
    in the front part of the parking lot.
23
    Around noon on May 16, 2002, Wendy Steffan was working at Clothestime and Virginia
24  Welch was looking at clothes.  A man, later identified as defendant, entered the store by
    himself; he was wearing a dress and carrying a purse.  Defendant walked through the racks
25  and then approached Steffan at the counter.  He pulled a handgun from his purse, ordered
    Welch to get on the floor, and told Steffan to give him the money or he would blow her away.
26  Welch got on the floor and Steffan gave defendant about $200 from both registers.
    Defendant ordered Steffan to the floor, told Steffan and Welch he would come back and kill
27

28  _____
    [2]Citations to the California Penal Code have been omitted.

them if they got up, and he left the store.

Immediately after defendant left Clothestime, Steffan locked the door and called 911.  Steffan described the gunman as wearing a tan floral print dress, a blonde wig, a straw hat, and he had blue eyes.  Welch was so upset by the armed robbery that she fainted and was later taken by ambulance to the hospital.

At trial, Welch and Steffan identified defendant as the armed robber.  Welch particularly remembered his "outstanding" eyes, and Steffan testified she would never forget his eyes.

Based on this incident, defendant was charged and convicted of count 5, second degree robbery of Steffan and Clothestime [ ], with the special allegation that he personally used a firearm [ ]; and count 7, second degree commercial burglary of Clothestime [ ].

<u>May 16, 2002–Robbery/Burglary of Susie's Deals (Counts 3, 4, & 6)</u>

Also around noon on May 16, 2002, several employees of Susie's were at the store for a district managers' meeting.  Eva Martinez, one of the employees, looked out of the front window of Susie's into the shopping center's parking lot, and saw a man walking towards the store who was dressed as an old lady.  The man, later identified as Carlos Landois, was by himself.  Martinez thought he was walking from a dark-colored or gray van, which was parked next to other cars in the far portion of the parking lot.

Landois entered Susie's and looked around, and the employees were concerned because he was in a dress and acted suspicious.  Landois declined offers of help and walked around the store.

Just a few seconds after Landois entered Susie's, Lindsay Atkinson, another store employee, looked out the front window and saw a man run past the store, and he was also wearing a dress and a wig.  Atkinson subsequently identified this man as defendant.  Atkinson watched as defendant ran into the parking lot, went to the back of an older-model van, and changed out of the dress to a T-shirt and boxer shorts.  Atkinson saw defendant look directly towards Susie's and Clothestime.  Defendant entered the back of the van and moved into the driver's seat.

Atkinson called out to another employee, Bonnie Johnson, and invited her to go outside for a cigarette.  Atkinson whispered to Johnson that she just saw a guy in a dress run out of Clothestime and rip off his wig, she thought that man robbed the other store, and she thought Landois was going to rob them.

Just as Atkinson and Johnson headed out of Susie's, Atkinson saw Landois produce a weapon, but the two women kept walking and went outside.  Landois did not stop the women from leaving the store.  Instead, he walked to the counter, pulled a gun from his purse, and grabbed the clerk, Casey Gomez.  He held the gun to Gomez's side and told her to give him the money from the register.  Gomez was frightened and had trouble opening the register.

Melissa Ivey, another employee, walked out of the store's restroom, and saw Landois behind the counter but she did not notice the gun.  She put her hand on his arm and said the he could not stand there.  Landois turned and pointed the gun at Ivey, and he grabbed $50 to $100 out of the register.  Landois told Ivey to open the second register.  Ivey replied it was empty but Landois insisted.  Ivey opened the second register, Landois saw it was empty, and he grabbed Martinez's purse from under the counter.

Based on this incident, defendant was charged and convicted of count 3, second degree robbery of Gomez and Susie's [ ]; count 4, second degree robbery of Ivey and Susie's [ ];

count 6, second degree commercial burglary of Susie's [ ]; and count 8, conspiracy to commit robbery [ ].

The Van and the Buick in the Parking Lot

While Landois was inside Susie's, Atkinson and Johnson were standing outside the store watching defendant and the van. The shopping center's parking lot was very crowded because people were arriving for lunch at the nearby fast food restaurants. Atkinson and Johnson flagged down California Highway Patrol Lieutenant Bruce Williams, who had pulled into the shopping center for lunch. They told Williams that a man dressed as a woman had just run out of Clothestime, a man dressed as a woman was inside Susie's, and they thought the men were robbing the stores.

Lieutenant Williams told the women he would check it out. He parked his patrol car and walked toward the two stores. Atkinson testified that Williams parked his patrol car directly behind the van she had been watching. Atkinson testified that the van slowly started to move out of the parking space just as Williams parked behind it. Atkinson thought the van traveled north toward Carl's Jr., which was located in the front of the parking lot. Atkinson believe the van was leaving the parking lot and lost sight of it.

In the meantime, Landois was still inside Susie's and tried to leave through the rear exit but it was locked, and he headed for the front door. Atkinson and Johnson were still outside and saw Landois run out of Susie's front door. One of their coworkers shouted that he had robbed them. Atkinson and Johnson saw Landois run next door to Clothestime. The two women went back into Susie's, locked the doors and lost sight of Landois.

Next door at Clothestime, Wendy Steffan was still on the telephone with the 911 operator when a man in a dress tried to enter the store. Steffan told the 911 operator that a man in a blue dress and a blonde wig just tried to get back into the store, but the doors were locked and he headed toward Susie's. Steffan thought he was the same guy who robbed her, but she realized he was not wearing a hat.

Stephanie Rego, another employee of Susie's, testified that as Landois ran out of Susie's, she saw a Highway Patrol car and an officer in the parking lot. Rego saw Landois run towards Clothestime, but "then he saw the cop. And he ran back left, and tried to get into [Susie's]." Rego held the doors closed so he could not get in. Landois pointed the gun at her, but Rego still refused to open the doors. Landois ran into the parking lot and Rego lost sight of him. An employee of another store called 911 and reported a man in a blue dress was running through the shopping center with a gun.

Lieutenant Williams was walking toward the stores when he saw a man in a dress run from the stores and head into the parking lot. Williams did not see the man's face and he disappeared into the crowd of shoppers. Williams testified that one of the female employees said the man was associated with a gray van, and she could see the van driving through the parking lot near Williams's patrol car. Williams ran to his patrol car and called for help.

Williams testified there were two vans in the parking lot. Both vans were traveling west and then went in different directions. Williams followed one van on a hunch that it was the suspect's vehicle. That van continued to travel west in the parking lot. Williams pulled up next to that van while it was still in the parking lot, looked inside the vehicle, saw that the driver was an elderly female, and believed he had followed the wrong van. He passed that van, continued westbound into the street, and drove around the streets to look for the other van but he never found it.

Rego testified that within a few minutes after Landois ran away, she saw a van and a car drive

by Susie's in the parking lot driveway directly in front of the stores. Martinez also saw the van and recognized it as the same vehicle that Landois walked away from before he robbed the store. Martinez initially thought the van's driver was Landois, but she later identified defendant as the van's driver. Atkinson and Johnson recognized the van as the vehicle that defendant entered after he changed out of the dress. Some of the store employees were able to read the van's license plate number as it drove past Susie's and it was later matched to Ramos's stolen vehicle.

Atkinson, Johnson, Martinez and Rego saw a dark-colored sedan traveling two to three car lengths behind the van. The vehicle was later identified as a blue Buick Regal. Martinez recognized the sedan's driver as Landois, the man who had just robbed Susie's.

The Attempted Murder of Officer Byerlee (Count 2)

Also around noon, as the robberies were in progress, Visalia Police Officers Brian Davis, Greg Byerlee and Russell Gauger were having lunch at the Carl's Jr. restaurant located in the front of the parking lot at the shopping center. They had separately arrived in marked patrol cars. They were eating lunch when they received a dispatch of an armed robbery at Clothestime. The suspect was described as a Hispanic male wearing a blue dress and a blonde wig; they did not receive any information about a van or any other type of vehicle.

The three uniformed officers left Carl's Jr., spread out through the parking lot, and walked toward Vons and the clothing store to look for the suspect. A Vons employee was outside the grocery store on his lunch break, and saw the police officers walk across the parking lot from Carl's Jr. Toward Vons as if they were "on a mission."

Officer Byerlee, who served on the police department's SWAT team and had advanced sniper training, looked under cars for the suspect then walked down the main driveway toward Vons. He saw a car going 25 to 30 miles per hour, which was extremely fast for the parking lot. The car, later identified as the blue Buick Regal, hit a speed bump and Byerlee heard the sound of brakes being applied hard. Byerlee was standing on the opposite side of a crosswalk that led into the front entrance of Vons and he was facing the front of the grocery store. The Buick slowed down in front of the grocery store's entrance. The driver's door opened, Landois stepped out of the Buick and he was holding a gun. Landois stood in front of the grocery store and started shooting directly at Byerlee.

Byerlee testified Landois walked toward him and fired multiple gunshots at him. "When I moved, he was tracking on me the entire time. He wasn't trying to get away." Byerlee testified he had "no doubt" that Landois was trying to kill him instead of trying to get away. Byerlee testified he was "convinced" that Landois was not going to stop firing until "I was dead or I stopped him. No doubt in my mind."

Byerlee turned away from the line of fire, went behind a planter and then faced Landois. Byerlee was about 15 feet from Landois, he fired one shot at Landois's head and Landois fell to the ground.

Officer Gauger was standing on the sidewalk adjacent to Vons when he heard squealing brakes. He turned toward the parking lot and saw Landois open the driver's door of the Buick and start shooting. Landois placed his gun between the car's door frame and window, and got out of the Buick while it was still rolling. Gauger was standing in front of Vons and behind Landois, and Landois was shooting into the parking lot toward Byerlee and Arby's restaurant, which was located in the front of the parking lot. Gauger testified Byerlee was directly in the line of fire. Gauger heard eight shots, then a loud boom and Landois fell down. Gauger drew his weapon, but Landois fell down before he had a clear shot.

Eva Martinez and Stephanie Rego were still at Susie's. They watched the van and the Buick driving together in the parking lot, and saw the Buick stop in front of Vons. They saw Landois get out of the driver's side and point his gun at an officer. Landois stood in front of Vons and faced the officer, and the officer was in the parking lot and faced the grocery store. No one else was with Landois. Martinez saw Landois fire several shots, then heard a single gunshot and Landois fell down. The store employees described general mayhem in the parking lot as multiple shots were fired.

Officer Byerlee shot Landois once in the front left temple. Landois, who was 24 years old, died at the scene. Landois was still dressed in women's clothing and was the only occupant of the Buick. Neither Byerlee nor Davis noticed a van in the parking lot before, during or after the shooting.

The Murder of Jeffrey Donaldson (Count 1)

While Landois was shooting in the parking lot, there were numerous people inside Arby's having lunch, including Jeffrey Donaldson, his wife and their two-year-old child. The Donaldsons were sitting in a booth when a bullet pierced the restaurant's wall, hit Jeffrey Donaldson in the front right temple, passed through his head and brain, and lodged into the window frame behind him. Donaldson collapsed and suffered massive bleeding from his grievous wound. The other patrons heard the sound of a bullet and hit the floor, there was pandemonium in the restaurant, and someone grabbed the Donaldsons' child so she would not see her father.

Donaldson, who was 33 years old, was rushed to the hospital, but he had suffered extensive brain damage. Later that night, his family decided to disconnect him from life support and he died.

Landois's Weapon and the Search of the Buick

A Glock nine-millimeter semiautomatic handgun was found next to Landois's body. There were eight nine-millimeter shell casings around Landois's body in the parking lot. One was a Winchester casing; the other seven were stamped "S&B." There was one live "S&B" cartridge in Landois's gun.

Officer Byerlee testified he only fired the one shot, which killed Landois. Byerlee's service weapon was a .357 caliber SIG Arms-brand pistol. Only one .357 caliber SIG Arms-brand casing was found in the parking lot.

Landois was driving a blue Buick Regal with Nebraska license plates. A wig and Eva Martinez's purse were found inside the car. The police also found a white plastic bag containing a pair of gray baggy pants, a brown belt and an "S" belt buckle. A wallet in the gray pants contained identification in defendant's name. There was another white plastic bag in the car that contained a pair of blue jeans with rolled-up cuffs, a blue and white checkered shirt, a blue belt and an "S" belt buckle. A woman's brown leather purse was on the front seat and it contained cash and latex gloves.

Arrest of Defendant and Recovery of the Van

Shortly after the shooting in the parking lot, Jeff Jones contacted the 911 operator and reported his observations earlier that morning of the two men in the Dodge van in the bank's parking lot and that one man was wearing a dress. Jones provided the van's license plate number and transmitted his digital photograph to the police department. However, neither defendant nor the van was found on the day of the shooting.

On the afternoon of May 17, 2002, Officer Ken Colyar of the Utah State Bureau of Investigation was on patrol on Interstate 70 in a sparsely populated area of southern Utah. Colyar stopped at a gas station in the small town of Thompson. Defendant approached him, said his vehicle ran out of gas out on the highway and he asked Colyar for a ride back to it. Colyar agreed and drove defendant about 30 miles away, where a Dodge van was parked on the side of the road. Defendant got out and filled up the van with a gas can.

Colyar noticed that defendant acted fidgety and reluctant to drive away. Defendant entered the van through a side window and Colyar realized he did not have the keys. Colyar checked the license plates and determined the vehicle was stolen and had possibly been used in an armed robbery in California the previous day. Colyar took defendant into custody and advised him that he was under arrest for possession of a stolen vehicle. Defendant replied that he knew the vehicle was stolen. Defendant said he was on his way to Denver to visit his mother, and added that his brother had been killed by the police. Colyar asked when it happened. Defendant did not answer the question, but said that Colyar would hear stuff about him on the radio and none of it was true.

Search of the Van

Defendant had been driving Ramos's stolen van. The van's steering column was smashed and the vehicle had extensive body damage. A Glock nine-millimeter semiautomatic handgun was on the front seat. The magazine was loaded with 10 Winchester cartridges and one bullet was in the chamber. There was a 50-count box of Winchester nine-millimeter cartridges in the van, but there were only 30 cartridges in the box.

The van also contained numerous articles of women's clothing, women's shoes, underwear and a wig. A cash drawer receipt from Clothestime was on the floor board. A woman's purse contained two live Winchester nine-millimeter cartridges. A plastic bag contained latex-type gloves similar to those found in the purse in Landois's Buick.

It was stipulated that both the Glock handgun found next to Landois's body and the Glock handgun recovered from the van driven by defendant were stolen from True Value Hardware in Bellevue, Nebraska on December 23, 2001.

In addition to the robbery and burglary charges based on the May 16, 2002, incident in the shopping center, defendant was also charged and convicted of count 1, first degree felony murder of Jeffrey Donaldson [ ], with the special circumstance that the murder was committed while defendant aided and abetted, assisted and was engaged in flight after having committed a robbery/burglary [ ]; and count 2, attempted murder of a peace officer (Byerlee) with the special allegation that the offense occurred while the officer was engaged in the performance of his duties [ ].

(LD 4, pp. 4-16).

## DISCUSSION

### I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the

1  United States Constitution.  The challenged conviction arises out of the Tulare County Superior

2  Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.

3  § 2241(d).  Accordingly, the Court has jurisdiction over this action.

4       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

5  1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

6  Lindh v. Murphy, 521 U.S. 320 (1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997);  Jeffries

7  v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), cert. denied, 520 U.S. 1107 (1997), overruled on

8  other grounds by, Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed

9  after statute's enactment).  The instant proceedings were initiated by the filing of the original petition

10 on February 25, 2010, after the enactment of the AEDPA, and thus this case is governed by the

11 AEDPA.

12      **II.  Legal Standard of Review**

13      A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he

14 can show that the state court's adjudication of his claim:

15       (1)  resulted in a decision that was contrary to, or involved an unreasonable application of,
          clearly established Federal law, as determined by the Supreme Court of the United States; or
16
          (2)  resulted in a decision that "was based on an unreasonable determination of
17        the facts in light of the evidence presented in the State court proceeding.

18 28 U.S.C. § 2254(d);  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);  Williams v. Taylor, 529 U.S.

19 at 412-413.

20      The first prong of federal habeas review involves the "contrary to" and "unreasonable

21 application" clauses of 28 U.S.C. § 2254(d)(1).  This prong pertains to questions of law and mixed

22 questions of law and fact.  Williams v. Taylor, 529 U.S. at 407-410;  Davis v. Woodford, 384 F.3d

23 628, 637 (9th Cir. 2004).  A state court decision is "contrary to" clearly established federal law "if it

24 applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it

25 confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but

26 reaches a different result."  Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams v. Taylor,

27 529 U.S. at 405.  A state court decision involves an "unreasonable application" of clearly established

28 federal law "if the state court applies [the Supreme Court's precedents] to the facts in an objectively

1    unreasonable manner." Brown v. Payton, 544 U.S. at 141; Woodford v. Visciotti, 537 U.S. 19, 24-

2    25 (2002).

3         Consequently, a federal court may not grant habeas relief simply because the state court's

4    decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable.

5    Wiggins v. Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409).  In

6    Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that

7    an "unreasonable application" of federal law is an objective test that turns on "whether it is possible

8    that fairminded jurists could disagree" that the state court decision meets the standards set forth in

9    the AEDPA.  If fairminded jurists could so disagree, habeas relief is precluded.  Richter, 131 S.Ct. at

10   786; Wetzel v. Lambert, ___S.Ct. ___, 2012 WL 538281 (Feb. 21, 2012) *2.   The AEDPA's

11   standard of "contrary to, or involv[ing] an unreasonable application of, clearly established Federal

12   law" is "difficult to meet," because the purpose of AEDPA is to ensure that federal habeas relief

13   functions as a "'guard against extreme malfunctions in the state criminal justice systems,'" and not

14   as a means of error correction.  Richter, 562 U.S. ___, 131 S.Ct. at 786 (quoting Jackson v. Virginia,

15   443 U.S. 307, 332, n. 5 (1979)(Stevens, J., concurring).  The Supreme Court has "said time and

16   again that 'an *unreasonable* application of federal law is different from an *incorrect* application of

17   federal law.'"  Cullen v. Pinholster, __U.S. __, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state

18   prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling

19   on the claim being presented in federal court was so lacking in justification that there was an error

20   well understood and comprehended in existing law beyond any possibility of fairminded

21   disagreement." Richter, 562 U.S. ___, 131 S.Ct. at 786-787.

22        Moreover, federal "review under § 2254(d)(1) is limited to the record that was before the

23   state court that adjudicated the claim on the merits." Cullen, 131 S.Ct. at 1398 ("This backward-

24   looking language requires an examination of the state-court decision at the time it was made.  It

25   follows that the record under review is limited to the record in existence at the same time–i.e., the

26   record before the state court.")

27        The second prong of federal habeas review involves the "unreasonable determination" clause

28   of 28 U.S.C. § 2254(d)(2).  This prong pertains to state court decisions based on factual findings.

1   Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under

2   § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's

3   claims "resulted in a decision that was based on an unreasonable determination of the facts in light of

4   the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. at 520;  Jeffries v.

5   Wood, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible,

6   thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment").

7   A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be

8   debatable among reasonable jurists."  Id. ; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir.

9   2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

10      The AEDPA also requires that considerable deference be given to a state court's factual

11   findings.   "Factual determinations by state courts are presumed correct absent clear and convincing

12   evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and

13   based on a factual determination will not be overturned on factual grounds unless objectively

14   unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."  Miller-

15   El v. Cockrell, 537 U.S. at 340.  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of

16   historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943,

17   976-077 (2004).

18      To determine whether habeas relief is available under § 2254(d), the federal court looks to

19   the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

20   Nunnemaker, 501 U.S. 979, 803 (1991);  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

21   Where the state court decided the petitioner's claims on the merits but provided no reasoning for its

22   decision, the federal habeas court conducts "an independent review of the record...to determine

23   whether the state court [was objectively unreasonable] in its application of controlling federal law."

24   Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853

25   (9th Cir. 2003).  "[A]lthough we independently review the record, we still defer to the state court's

26   ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  Where the state court

27   denied the petitioner's claims on procedural grounds or did not decide such claims on the merits, the

28   deferential standard of the AEDPA do not apply and the federal court must review the petitioner's 's

1   claims de novo.  Pirtle v. Morgan, 313 F.3d at 1167.

2        The prejudicial impact of any constitutional error is assessed by asking whether the error had

3   "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.

4   Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding

5   that the Brecht standard applies whether or not the state court recognized the error and reviewed it

6   for harmlessness).  Some constitutional errors, however, do not require that the petitioner

7   demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v.

8   Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas petition governed by the AEDPA

9   alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the

10  Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the

11  Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002);  Musladin v. Lamarque,

12  555 F.3d 830, 835 (9th Cir. 2009).

13       **III.  Review of Petitioner's Claims.**

14       The instant petition itself alleges the following as grounds for relief:

15  **Ground One**      **The trial court abused its discretion and violated Petitioner's**
                       **Sixth Amendment right to counsel when it denied Petitioner's**
16                     **motion to substitute counsel at trial without making**
                       **adequate inquiries regarding counsel's competence to**
17                     **represent Petitioner.**

18
19  **Ground Two**      **The trial court's response to a jury question during**
                       **deliberation contained an unconstitutional explanation of**
20                     **reasonable doubt and impermissibly directed a verdict on an**
                       **element of murder, violating Petitioner's right to due process**
21                     **and trial by jury.**

22  **Ground Three**    **Insufficient evidence was presented to support a finding that**
                       **Petitioner acted with the intent to kill or with reckless**
23                     **disregard for human life. [3]**

24  **Ground One**      **The trial court abused its discretion and violated Petitioner's**

25       [3] In Respondent's Answer, Respondent also addresses a claim that the trial court erroneously failed to instruct the
26  jury on a special allegation that Petitioner knew the officer he attempted to kill was engaged in the performance of his duties.
    (Doc. 19, p. 30).  Respondent cites to page three of the petition as grounds for addressing this contention.  However, page
27  three of the petition is a handwritten supplement to question no. 9(d) on the form petition.  Question no. 9(d) on the form
    petition solicits information on the grounds raised by Petitioner in the 5th DCA on his direct appeal.  (Doc. 1, p. 2).  Thus,
28  in this Court's view, this issue is not raised by Petitioner as a separate ground for review in the instant habeas petition.
    Accordingly, the Court will not address it further.

1

2

3

**Sixth Amendment right to counsel when it denied Petitioner's motion to substitute counsel at trial without making adequate inquiries regarding counsel's competence to represent Petitioner.**

4   Petitioner first contends that he was deprived of his due process rights when, during trial, the

5   trial court denied Petitioner's repeated motions for new counsel pursuant to People v. Marsden, 2

6   Cal.3d 118 (1970).  Respondent contends that no clearly established federal law exists that a

7   defendant has a Sixth Amendment right to substitute attorney, and also that the state court

8   adjudications were neither contrary to nor an unreasonable application of clearly established federal

9   law.  The Court agrees with Respondent for the reasons set forth below.

10   A.  Proceedings At Trial.

11   As the 5th DCA noted in its opinion, between May 2002, when the criminal complaint was

12   filed, and the date of trial in July 2007, Petitioner made numerous motions to change attorneys or to

13   represent himself in propria persona.  On January 23, 2003, Petitioner moved to dismiss his court-

14   appointed public defender, Berry Robinson, and to represent himself; Petitioner also indicated that he

15   wished to plead guilty to the charged.  When advised of the seriousness of the charges, Petitioner

16   withdrew his motions and agreed to keep appointed counsel.  (LD 4, p. 17).

17   On July 28, 2003, Petitioner filed a second Marsden motion against Robinson, asserting that

18   his counsel "left him in the dark about his case, refused to turn over the police reports, failed to file a

19   motion to dismiss the charges, and already hired experts for the death penalty issues, which showed

20   Robinson was against him."  (LD 4, p. 18).  Robinson told the court he had turned over at least 1,000

21   pages of police reports and discovery to Petitioner, even though Petitioner ignored his advice that it

22   was not wise to keep such reports in jail because of jailhouse informants.  Although Petitioner

23   wanted a tape recorder to listen to recorded statements from witnesses, such devices were not

24   permitted in the jail unless inmates were pro se.  Regarding the motion to dismiss, Robinson told the

25   court he had already researched the issue and was prepared to file a section 995 motion to dismiss

26   certain charges.  Regarding expert witnesses, counsel told Petitioner that it was prudent to prepare

27   for the penalty phase as well as for the guilt phase.  Counsel told the court that the real problem was

28   Petitioner's inability to accept liability for the victim's death under California's felony murder rule:

1      I have explained that to him a number of times, and I told him that's the main issue we are
    attacking in his case, but he is frustrated with that. [¶] And so no matter where we talk about
2      it or what my goal is when I go to see him, we end up talking about why I am not doing what
    I should be doing, why the District Attorney is charging him with crimes that his brother has
3      committed and I am not fighting for him.

4  (LD 4, p. 19).  At the conclusion of the hearing, the court denied the motion, finding that Robinson

5  was doing a competent job and that no conflict of interest existed.  (Id.).

6         On March 18, 2004, Petitioner filed his second <u>Faretta</u> motion[4], which was granted by the

7  trial court.  Afterward, Petitioner filed numerous motions to dismiss the felony murder charges, but

8  all were denied.  (<u>Id</u>. at p. 20).  The court moved the trial date from January 2006 to July 2006 in

9  order for Petitioner to have time to enlist expert witnesses for the penalty phase.  (<u>Id</u>.).

10         On March 22, 2006, Petitioner requested appointed counsel, saying he realized that, by

11  representing himself, he had bitten off "more than I can chew."  On April 10, 2006, the court

12  appointed Marcus Olmos as Petitioner's attorney.  (<u>Id</u>.).  On February 7, 2007, Petitioner filed a

13  motion to discharge Olmos, contending, inter alia, that he was in violation of ethical rules, failed to

14  prepare a defense, did not have penalty phase experts ready, and came to court intoxicated.  (<u>Id</u>., p.

15  21).  Olmos explained the defense theory of the case to the court, but conceded that a psychologist

16  had yet to evaluate Petitioner, and that a continuance was required.  The judge noted that he too had

17  smelled alcohol on Olmos's breath but that his performance in court had not suffered as a result, and

18  cautioned Olmos about future drinking.  (<u>Id</u>. at p. 22).  The court then denied Petitioner's <u>Marsden</u>

19  motion.

20         On June 20, 2007, Petitioner again filed a <u>Marsden</u> motion, asserting that Olmos would not

21  accept collect phone calls from Petitioner, had failed to visit Petitioner, and was prejudiced and

22  biased against him.  (<u>Id</u>.).  At the hearing, Petitioner further contended that Olmos had failed to file

23  further section 995 motions to dismiss charges.  Olmos explained his efforts to obtain penalty phase

24  witnesses and the unhelpful results of recent ballistics tests.  The court explained to Petitioner that

25  earlier section 995 motions had been partially granted and that Olmos was not required to file

26

27       [4]<u>Faretta v. California</u>, 422 U.S. 806, 95 S.Ct. 2525 (1975), held that the Sixth Amendment's right to counsel also
includes the right to self-representation.  Accordingly, motions by defendants to represent themselves are referred to as
28  "Faretta" motions.

1   further, frivolous section 995 motions.  (Id., p. 24).  The court then denied the Marsden motion and

2   emphasized that the trial would commence on July 31, 2007, and that no further continuances would

3   be granted, essentially giving Petitioner the choice of going to trial with Olmos or representing

4   himself.  (Id.).

5       That same day, Petitioner sent the trial judge a letter stating that if Olmos failed to raise the

6   issues Petitioner wished to raise, Petitioner would be forced to represent himself.  On July 25, 2007,

7   Petitioner then filed a formal Faretta motion, arguing that the court should have granted his earlier

8   Marsden motions to dismiss Olmos.  At the hearing, Olmos disagreed with Petitioner's proffered

9   defense that Landois had committed "suicide by police officer," stating that no evidence existed to

10  support a suicide theory.  The court rejected Petitioner's request for an expert on his suicide theory,

11  noting that no expert could know what was in Landois mind.  The court then denied the Marsden

12  motion, pointing out Petitioner's long history of dissatisfaction with every appointed attorney, and

13  the Olmos's "style" of representation.  (LD 4, p. 26).  However, the court also gave Petitioner one

14  last opportunity to represent himself, but indicated that no further continuances would be granted if

15  he chose to proceed pro se.  (Id.).  The court also strongly advised Petitioner against representing

16  himself.  Nevertheless, Petitioner chose to discharge Olmos and represent himself at trial.  (Id., p.

17  28).

18      B. The 5th DCA's Decision.

19      In rejecting Petitioner's claim that the trial court erred in denying his Marsden motions, the

20  5th DCA rules as follows:

21      In the instant case, defendant contends the court abused its discretion in denying the
    February, June and July 2007 Marsden motions because the court failed to make the
22  appropriate inquiries, ask any follow-up questions regarding his complaints against
    [Petitioner's eventual trial attorney] Olmos, and consider whether defendant had legitimate
23  reasons for distrusting Olmos.  Defendant complains the court failed to conduct adequate
    inquiries into his continued complaints about Olmos as in People v. Hill (1983) 148
24  Cal.App.3d 744 (Hill), where the appellate court reversed for Marsden error because the trial
    judge failed to question counsel regarding the defendant's complaints, and instead undertook
25  its own off-the-record investigation.  (Id. at 754-755).  Defendant also relies on People v.
    Cruz (1978) 83 Cal.App.3d 308 (Cruz), where the trial court similarly failed to ask the
26  defense counsel to address the defendant's complaints.  (Id. at 317.)

27      As we have already noted, however, defendant's Marsden arguments are made in a vacuum
    and fail to account for the lengthy history of Marsden and Faretta motions he made in the five
28  years between his arrest and the start of trial.  In contrast to Hill and Cruz, the entirety of the

record reflects that at every hearing, the court allowed defendant to explain the basis for his contentions and relate specific instances of counsel's alleged inadequacies, directed counsel to respond, and asked counsel about specific issues.  Both [Petitioner's original trial attorney] Robinson and Olmos had adequate explanations for all of defendant's complaints, and to the extent there was a credibility question between defendant and counsel at the hearing, the court was entitled to accept counsel's explanation.  (People v. Abilez (2007) 41 Cal.4th 472, 488.)  Defendant was given "full opportunity to air all of his complaints, and counsel to respond to them."  (People v. Smith (2003) 30 Cal.4th 581, 606.)

In ruling upon a Marsden motion, the court's inquiry "is forward-looking in the sense that counsel would be substituted in order to provide effective assistance in the future.  But the decision must always be based on what has happened in the past."  (People v. Smith (1993) 6 Cal.4th 684, 695.)  The majority of defendant's Marsden complaint against Olmos were merely variations on the same themes he already raised against his first appointed counsel, Robinson, during the earliest stages of this case.  As defendant clearly indicated in his motions and statements, his lack of confidence in both Robinson and Olmos was based upon his frustration about being charged with the murder and attempted murder committed by Landois.  Both Robinson and Olmos explained the felony-murder rule to defendant, and Olmos provided defendant with legal authorities and jury instructions about a nonshooter's culpability, but defendant accused both of them of working against him by giving him such information and demanded they keep filing section 995 motions and pretrial motions to dismiss those counts.

As the court and his attorneys repeatedly advised defendant, a section 995 motion cannot be renewed unless there are changed circumstances, such as a substantial change in the facts or law, which have a significant bearing on the question of whether the defendant was committed without probably cause.  (People v. Sherwin (2000) 82 Cal.App.4th 1404, 1411.)  Robinson vigorously attacked the validity of the murder and attempted murder charges based upon Landois's acts, and obtained the dismissal of the charge that defendant murdered Landois.  Nevertheless, defendant repeatedly claimed he had no confidence in Robinson and later in Olmos because they refused to file additional section 995 motions, a motion for reconsideration, or other pretrial motions to obtain dismissal of the murder and attempted murder charges.  Defendant seized upon Olmos's comment about asking the prosecutor for his thoughts about filing another section 995 motion as an example of Olmos working against him.  Olmos explained to the court that he never spoke to the district attorney's office, and he independently determined there was no basis for another section 995 motion.  Defendant's tactical disputes with Olmos and his insistence that Olmos file frivolous motions for dismissal were insufficient to establish an irreconcilable conflict under Marsden.

Defendant asserts the court did not address his complaints that Olmos failed to have penalty phase experts examine him prior to trial, that Olmos reeked of alcohol during every visit with defendant, and the Marsden motion should have been granted because defendant lost all confidence in Olmos based upon these issues.  Again, the record refutes defendant's contentions on these points.  At the February 2007 Marsden hearing, the court addressed defendant's complaints about the psychological expert, Olmos said the evaluation would occur within the next month, the court chastised Olmos for the delay, but it granted a continuance so the evaluation could occur before the trial started. [N. 12] While Olmos had not obtained an expert evaluation at that point, he otherwise demonstrated his complete familiarity with the case and preparation of the defense theory, and later advised the court that two psychological evaluations had occurred and a third was scheduled for the same day as another Marsden hearing.

> [N. 12] We note that in July 2003, defendant brought a Marsden motion against Robinson, his first attorney, partially based upon his complaint that Robinson had already hired penalty phase experts, which defendant interpreted as meaning that

Robinson already believed he was guilty.

As for Olmos's purported alcohol use, the court acknowledged it also smelled alcohol on Olmos's breath but further noted that it did not observe any impairment of Olmos's abilities. Nevertheless, the court warned Olmos and advised defendant that it would take the appropriate steps if it believed Olmos's abilities were impaired.  Defendant did not raise this issue again in subsequent Marsden hearings, the court did not make any further comments to Olmos, and the record's silence necessarily implies that the court did not observe any conduct indicating the possible impairment of Olmos's abilities or that he continued to have alcohol on his breath.  Indeed, at the June 2007 Marsden hearing, Olmos extensively discussed his trial preparation, including the unfavorable results of a ballistics test that proved Landois's gun could have fired the fatal shot into the restaurant.  Again, defendant's complaints about Olmos were based upon his frustration with not hearing what he wanted to hear from his attorney.

Defendant complains that he was forced to assert his Faretta rights and represent himself at trial because of the court's erroneous Marsden rulings, such that his Faretta waivers were not knowing, intelligent and voluntary.  When confronted with a request for self-representation, the trial court must make the defendant aware of the nature of the charges against him, the possible penalties, and the dangers and disadvantages of self-representation, "so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" (People v. Dent (2003) 30 Cal.4th 213, 217-218; United States v. Hernandez (9th Cir. 2000) 203 F.3d 614, 623-624....)  "If the trial court's warnings communicate powerfully to the defendant the 'advantages of proceeding pro se,' that is all "Faretta requires.'" (People v. Sullivan, supra, 151 Cal.App.4th at p. 546.)

As we have demonstrated ante, the court herein complied with Faretta and communicated powerfully to defendant the disadvantages of representing himself in a capital case, explained that standby counsel would not be appointed, and literally begged him not to discharge Olmos.  Defendant was clearly aware of the serious situation but insisted on asserting his Faretta rights, and his waivers were knowing, intelligent and voluntary.

Defendant's Faretta request occurred on the scheduled first day of trial.  While a defendant has an absolute right to represent himself, the defendant must assert that right in a timely manner.  When a Faretta request is not made in a timely manner prior to trial, self-representation is no longer a matter of right but subject to the court's discretion.  (People v. Bradford (1997) 15 Cal.4th 1229, 1365.)  If a trial court grants an untimely Faretta request, "the defendant may not be heard to complain on appeal that his or her motion should not have been granted. [Citations.]" (Id. at p. 1367.)   The court herein granted defendant's demand to represent himself, after extensively warning defendant of the consequences, and defendant cannot now complain that ruling was inappropriate under the circumstances.

We further note that a Faretta request for self-representation does not trigger a duty to conduct a Marsden inquiry or suggest substitution of counsel as an alternative.  (People v. Crandall (1988) 46 Cal.3d 833, 854-855, overruled on other grounds in People v. Crayton (2002) 28 Cal.4th 346, 364-365.)  Nevertheless, when defendant made his Faretta request on the scheduled first day of trial, the court decided to conduct a Marsden hearing out of an abundance of caution, even though the court was not required to do so.  The court again invited defendant to explain the reasons why he was frustrated with Olmos and defendant again repeated the same meritless reasons–that Olmos would not file various motions or pursue unsupported defendse theories.

Indeed, the entirety of the record strongly suggests defendant was "playing 'the Faretta game,'" and able to substantially delay the trial by "juggling his Faretta rights with his right to counsel interspersed with Marsden motions."  (People v. Williams (1990) 220 Cal.App.3d

1165, 1170.) As the court noted at the final <u>Marsden/Faretta</u> hearing, defendant represented himself for nearly two years and the matter was repeatedly continued so he could prepare, he then decided he wanted an attorney at the last moment, the court appointed Olmos and granted additional continuances for over a year, but defendant was still not satisfied. "Now here we are a few weeks before trial and you do, you don't, you do, you don't want Mr. Olmos to represent you. You do, you don't, you do, you don't want to go prop per." It seemed that defendant only wanted to represent himself "if the court would not give him another attorney...[I]t was pretty obvious that this defendant was simply playing games with the court." (<u>People v. Williams</u> at p. 1170; <u>People v. Horton</u> (1995) 11 Cal.4th 1068, 1111.) Nevertheless, defendant's <u>Faretta</u> rights were knowing and voluntary.

We thus conclude that defendant's <u>Marsden</u> motions were without merit, the court did not abuse its discretion in denying the motions, defendant was not "forced" to represent himself, and he gave knowing and voluntary waivers of his constitutional rights under <u>Faretta</u>.

(LD 4, pp. 29-34).

C.   <u>Petitioner's Sixth Amendment Rights Were Not Violated</u>.

Under California law,

[s]ubstitute counsel should be appointed '. . . whenever, in the exercise of its discretion, the court finds that the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel [citation], or, stated slightly differently, if the record shows that the first appointed attorney is not providing adequate representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation].'

<u>People v. Smith</u>, 6 Cal.4th 684 (1993).

California's standard is consistent with federal standards.   The denial of a motion to substitute counsel implicates a defendant's Sixth Amendment right to counsel and therefore is properly considered in a habeas proceeding.   <u>Bland v. California Dep't of Corrections</u>, 20 F.3d 1469, 1475 (9th Cir. 2000).  It is well-established that the Sixth Amendment requires an appropriate inquiry on the record into the grounds for a motion for new counsel, and that the matter be resolved on the merits before the case goes forward.   <u>Schell v. Witek</u>, 218 F.3d 1017, 1025 (9th Cir.2000).  It is also well-settled that a defendant does not have the right to counsel of his choice in a criminal proceeding.   <u>Caplin & Drysdale, Chartered v. United States</u>, 491 U.S. 617, 624 (1989); <u>United States v. Rewald</u>, 889 F.2d 836, 856 (9th Cir.1989).

In reviewing a denial of a motion for new counsel, the constitutional question this Court must answer is "whether the denial actually violated [Petitioner's] constitutional rights in that the conflict between [Petitioner] and his attorney had become so great that it resulted in a total lack of

1  communication or other significant impediment that resulted in turn in an attorney-client relationship

2  that fell short of that required by the Sixth Amendment." Schell, 218 F.3d at 1026.

3       At the outset, Respondent correctly notes that there is no "clearly established federal law"

4  holding that a defendant's constitutional right to counsel is violated by a state court's handling of a

5  defendant's motion to substitute counsel.  See Plumlee v. Masto, 512 F.3d 1204, 1210-1211 (9th Cir.

6  2008)(defendant's dislike or distrust of trial attorney insufficient to implicate Sixth Amendment

7  right).  While a defendant has the right to make a motion for new counsel based on the defendant's

8  perception of ineffective assistance of counsel, he does not have an automatic right to the

9  substitution of counsel simply because he is dissatisfied with appointed counsel's performance.

10  Jackson v. Ylst, 921 F.2d 882, 888 (9th Cir.1990).  The Sixth Amendment only guarantees the

11  effective assistance of counsel, not the existence of a "meaningful relationship" between an accused

12  and his counsel.  See Morris v. Slappy, 461 U.S. 1, 14, 103 S.Ct. 1610 (1983).  Moreover, as

13  mentioned above, the trial court is required to make an appropriate inquiry into the relationship

14  between a defendant and his counsel.  Schell, 218 F.3d at 1027.

15       The record in this case establishes, contrary to Petitioner's assertions, that the trial court

16  conducted hearings regarding every request for new counsel filed by Petitioner, at each of which

17  Petitioner was provided an opportunity to voice his reasons for new counsel, and Olmos was

18  required to respond to Petitioner's concerns.  In each case, the trial judge made lengthy and probing

19  inquiries of both Olmos and Petitioner regarding Petitioner's allegations.  In each instance, the trial

20  court concluded that Olmos was providing a competent defense, that Petitioner was upset with being

21  charged with the death of a person shot by his brother, and that further attempts to dismiss the

22  felony-murder charges under section 995 would be frivolous.

23       It is thus clear from the record recounted by the 5th DCA that Petitioner's contention that the

24  trial court's inquiry was inadequate is unfounded.  (Doc. 23, p. 5).  Petitioner's complaints regarding

25  his counsel's performance centered on disagreements over trial tactics and Petitioner's persistent

26  refusal to accept the reality of the felony-murder rule as applied to his case, not on any actual conflict

27  of interest or on a relationship that had so degraded that Petitioner could not meaningfully participate

28  in his own defense.  Although Petitioner disagreed with various tactical decisions by Olmos, those

1  disagreements did not warrant substitute counsel.  See Brookhart v. Janis, 384 U.S. 1, 8, 86 S.Ct.

2  1245 (1966) ("[A] lawyer may properly make a tactical determination of how to run a trial even in

3  the face of his client's incomprehension or even explicit disapproval.")

4      Olmos's delay in obtaining the services of expert witnesses for the penalty phase, while

5  unfortunate, did not result in any prejudice to Petitioner.  Moreover, Petitioner does not claim that

6  the witnesses that Olmos had identified were inadequate or otherwise demonstrated Olmos's

7  incompetent representation.  Finally, although Olmos's use of alcohol during his representation of

8  Petitioner was rightfully a cause for concern, the record establishes that the trial judge was well

9  aware of the situation, that he monitored it carefully vis-a-vis the quality of representation provided

10  by Olmos, and that he appeared ready to intercede if, in his opinion, Olmos's representation of

11  Petitioner appeared to be compromised in any way by Olmos's use of alcohol.

12      Based on the foregoing, Petitioner has failed to show that the trial court's denial of his three

13  Marsden motions " actually violated [Petitioner's] constitutional rights in that the conflict between

14  [Petitioner] and his attorney had become so great that it resulted in a total lack of communication or

15  other significant impediment that resulted in turn in an attorney-client relationship that fell short of

16  that required by the Sixth Amendment." Schell, 218 F.3d at 1026.  To the contrary, the ongoing

17  friction between Olmos and Petitioner, while lamentable, appears to this Court to fall well within the

18  normal parameters for such proceedings, given the gravity of the charges and the severity of the

19  potential sentence.

20      Regarding Petitioner's Faretta claim, that argument is premised entirely on the assumption

21  that Petitioner would not have needed to represent himself at trial if the court had not erred by

22  denying his Marsden motions.  Since this Court concludes that the trial judge did not err in denying

23  the three Marsden motions, it is necessarily the case that Petitioner's Faretta motion is also without

24  merit.  The record shows that Petitioner was fully advised of the problems inherent in self-

25  representation.  Indeed, the record shows that the trial judge practically pleaded with Petitioner not to

26  represent himself.  Despite all of these advisements and admonishments, however, Petitioner,

27  knowingly and with full understanding of the consequences, made the voluntary choice to proceed

28  pro per.  Thus, Petitioner's claim, raised in his Traverse, that his Faretta advisement was not

1 | knowing and intelligent, has no basis in this record.  (Doc. 23, p. 5).   Accordingly, Petitioner's

2 | argument that the court's denial of his <u>Faretta</u> motion violated the Sixth Amendment is without

3 | merit.

4 |      For the same reasons, the California Court of Appeal's rejection, and the California Supreme

5 | Court's summary denial, of this claim was therefore proper as well.  As the state court adjudication

6 | was not contrary to nor an unreasonable application of clearly established Federal law, the claim

7 | must be denied.[5]

8 | **Ground Two**     **The trial court's response to a jury question during deliberation**

**contained an unconstitutional explanation of reasonable doubt and**

9 | **impermissibly directed a verdict on an element of murder, violating**

**Petitioner's right to due process and trial by jury.**

10 |

11 |     A. <u>The Proceedings At Trial</u>.

12 |      During jury deliberations, the jury sent the trial judge a note asking whether it mattered who

13 | had fired the fatal shot that killed the victim, Donaldson.  (LD 4, p. 48).  Petitioner argues that the

14 | trial court's response reduced the prosecution's burden of proof and effectively resulted in a directed

15 | verdict of guilt.  The Court finds Petitioner's argument unpersuasive.

16 |      At trial, a major issue in Petitioner's self-representation was whether Donaldson was killed

17 | by Landois's gun.  In closing argument, the prosecutor made several comments that referenced the

18 | defense theory.  First, the prosecutor told the jury as follows:

19 |      It would not have matter[ed] if Officer Gauger would have been the one pulling the trigger
trying to hit this person shooting at his fellow officer and that bullet would have traveled

20 |      through the air and killed Mr. Donaldson....[¶] The law is clear, it doesn't matter....

21 | (LD 4, p. 49).

22 |      Later, the prosecutor continued this theme, stating:

23 |

24 |     [5]In his Traverse, Petitioner's spends considerable time attempting to rebut the 5th DCA's suggestion that Petitioner

25 | was "playing the <u>Faretta</u> game." (Doc. 23, pp. 6-8).  Petitioner argues that he was initially overcome with grief over Landois's death, that he did not understand what was legally required to prepare a case of this gravity for trial, and, consequently, that

26 | he did not fully appreciate the quality of work his first attorney, Robinson, had done.  The Court, however, need not address these points.  An analysis of the sufficiency of the trial court's <u>Marsden</u> inquiries does not require that the Court consider

27 | Petitioner's ulterior motives in seeking to remove Olmos apart from those grounds expressed by Petitioner during the hearings on the record.  Nor is anything that occurred while prior counsel, Robinson, was representing Petitioner directly relevant to

28 | Ground One since Petitioner is not challenging any trial court ruling that was made while Robinson was counsel of record.

If the robbery of those clothing stores cause[d] Jeff Donaldson to die, it doesn't matter who pulled the trigger. The fact remains the only evidence of who pulled the trigger, the only evidence, is that Carlos Landois pulled the trigger. But it doesn't matter. Any more than it wouldn't matter had Officer Gauger pulled the trigger.

(Id., p. 50).

During deliberations, the jury sent the judge the following question:

What is the instruction of the law when it comes to felony murder charge #1 charges. The prosecutor said it does not matter what gun the bullet came from that killed the victim. Is that true??"

(Id.).

After reading the question back to the jurors, the judge gave the following response:

Well, technically, it is not true, that is not true. It does matter what gun the bullet came from that killed the victim.

Now, there are different kinds of murder. The defendant is charged in this case with felony murder. That's a murder during the commission of a robbery or a burglary. Now, you have an instruction on that particular type of murder.

There's another type of murder called [provocative] act murder. And that is a situation where one of the participants during the robbery starts a gun battle with police, and the police officer in self-defense either kills an innocent bystander or even–even the guy that starts–the other defendant, the other guy that's starting the gun battle, if either one of those people are killed by the police officer, that's called [provocative] act murder.

All the participants in the robbery in a [provocative] act murder, if it is still ongoing as defined in the instruction, would be–would or could be charged with the killing that occurred because the officer was defending himself. And that could be either under [provocative] act murder or felony murder or the Felony Murder Rule.

In this case, you are not being asked to consider that [provocative] act murder. No instructions were given for that type of a murder because there is no evidence that that type of a murder occurred. Because the defendant said it occurred doesn't make it so.

There's no evidence that anybody else fired their weapon. The only evidence you have is that one person fired their weapon other than the deceased brother of the defendant, and that was Officer Byerlee.

You may only consider evidence that is evidence. You are not to speculate as to what might have happened. You must decide–make your decision and base your decision only on the evidence that's been presented.

If the People haven't met their burden to prove felony murder beyond a reasonable doubt, you must find the defendant not guilty.

If you have a reasonable doubt that the felony murder occurred as defined in the instructions, then you must find the defendant not guilty of that offense. That doubt, however, must be based on reason and not speculation.

1   What does the evidence tell you?  You are not to make a speculation as to what might have
    happened if there is no evidence to support that belief.

2

3   You are the judges of the facts and must base your decision on the facts as they relate to the
    charges.  And that's the only way I can explain that, folks.

4   (LD 4, pp. 51-52).  The jury then continued with their deliberations and subsequently returned a

5   verdict of guilty as to the felony murder charge.

6   In rejecting Petitioner's contention of error, the 5th DCA reasoned as follows:

7   In the earliest stages of this case, the court granted defendant's section 995 motion and
    dismissed the charge that defendant murdered Landois, based on Byerlee's fatal shooting of

8   Landois, because it found defendant could only be guilty of Landois's death under the
    provocative act theory, there was no evidence that defendant committed any acts beyond the

9   robbery and escape, and those acts were insufficient to trigger that theory.  Defendant could
    not be guilty of Donaldson's murder under the provocative act theory for the same

10  reasons–defendant committed the armed robbery and was trying to escape, but such acts were
    insufficient to trigger the provocative act theory since he did not start the shootout in the

11  parking lot. [Citations.] Instead, the prosecution relied upon the felony-murder rule to hold
    defendant culpable as a non-shooting accomplice in Donaldson's murder.

12

13  While the prosecutor used his closing argument to extensively and correctly discuss the
    felony murder rule, he erroneously suggested that defendant could be guilty of first degree

14  murder even if Officer Gauger fired the fatal shot into the restaurant.  Defendant, acting as his
    own attorney, seized upon this issue in his own closing argument and argued that Gauger

15  fired the fatal shot, and failed to realize that he was walking straight into the prosecutor's trap
    of the provocative act theory.

16  The jury's note expressly stated that the question was triggered by the prosecutor's insistence
    that the identity of the gunman who fired the fatal shot did not matter, and that defendant

17  would still be guilty of Donaldson's murder if Officer Gauger fired the fatal shot.  In
    reviewing the question and composing a response, the court was extremely concerned the

18  jury might convict defendant of murder under the provocative act theory, for which the jury
    was not instructed, instead of the prosecution's theory of felony murder.  The court properly

19  discharged its duties under section 1138 by distinguishing felony murder from provacative
    act murder, and ensured the jury would not follow the prosecutor's erroneous arguments and

20  convict defendant of the first degree murder based upon a theory completely unsupported by
    either facts or law.

21

22  Defendant acknowledges that during the instructional phase, the court properly instructed the
    jury on felony murder, the prosecution's burden of proof, and the definition of reasonable

23  doubt.  However, defendant seizes upon the court's italicized statements to the jury about the
    absence of facts or law to support the provocative act theory, as set forth ante, and contends

24  such statements negated the prior instructions, reduced the prosecution's burden of proving
    murder beyond a reasonable doubt, directed a verdict of felony murder, and prevented the

25  jury from speculating upon the absence of evidence to find the prosecution failed to meet its
    burden.

26  Defendant is correct that "reasonable doubt may arise from the lack of evidence at trial as
    well as from the evidence presented. [Citation.]" (People v. Campos (2007) 156 Cal.App.4th

27  1228, 1238.)  The court's statements did not reduce the prosecution's burden or amount to a
    directed verdict, but correctly advised the jury about "the almost self-evidence principle that

28  the determination of defendant's culpability beyond a reasonable doubt...must be based on a

review of the evidence presented." [Citations.] The court's response properly advised the jury that the People could not meet the burden of proof "based on evidence other than that offered at trial." [Citations.] The court did not tell the jury that it could not consider any perceived lack of evidence in determining whether there was a reasonable doubt as to defendant's guilt. [Citation.]

While the jury may rely on inferences to reach its verdict, "those interences must be reasonable.  An inference is not reasonable if it is based only on speculation. [Citation.] "A reasonable inference... 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work...A finding of fact must be an inference drawn from evidence rather than...a mere speculation as to probabilities without evidence.'" [Citation.] The court's statements ensured the jury would not rely on speculation to convict defendant of murder under a theory unsupported by fact or law.

Defendant contends the court's statements were similar to those found erroneous in People v. McCullough (1979) 100 Cal.App.3d 169.  In that case, the jury asked a question about one of the elements of the charged offense.  As the court responded to the question and discussed the concept of reasonable doubt, one juror asked "So then the doubt must arise from the evidence." (Id. at p. 181.)  The court replied:

> Well, I would answer that yes, if you are saying–if your question is–what is reasonable doubt–reasonable doubt is that state of the case which, after a comparison and consideration of all of the evidence–that is the evidence introduced in the trial–after a comparison and consideration of all of the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge. (Ibid.)

McCulloch held the court "misled the jury by telling it that the 'doubt must arise from the evidence' for the reasonable doubt prescribed by the statute may well grow out of the lack of evidence in the case as well as the evidence adduced. [Citations.] However, McCulloch found the error was not prejudicial.  (Id. at pp. 183-184.)

In contrast to McCulloch, the court herein did not tell the jury that reasonable doubt could only arise from the evidence presented at trial.  When the court's comments are read in context, it did not reduce the burden of proof or violate defendant's due process rights, but ensured the jury would not convict defendant of Donaldson's murder under the factually unsupported and legally invalid provocative act theory. [Citations.] The was no likelihood that the trial court's statements caused the jury to misunderstand the reasonable doubt standard....

(LD 4, pp. 53-57).

> B.  General Principles Concerning Jury Inquiries.

This Court's review of Petitioner's claim of state instructional error is "limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68, 112 S.Ct. 475 (1991); 28 U.S.C. § 2241.  Under the Constitution, "every fact necessary to constitute the crime with which [a defendant] is charged" must be proved "beyond a reasonable doubt." In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068 (1970).  It necessarily follows that constitutional trial error occurs when a jury makes a guilty determination on a charged offense

1    without a finding as to each element of the offense.  According to the Supreme Court, a jury

2    instruction that omits an element of the offense constitutes such an error.  Neder v. United States,

3    527 U.S. 1, 8, 119 S.Ct. 1827 (1999).  However, such an error "does not necessarily render a

4    criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence."  Id. at

5    9.  Provided that such an error occurred, Petitioner's conviction can only be set aside if the error was

6    not harmless under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824 (1967).  Neder, 527 U.S. at 15.

7    Under the Chapman harmless error test, it must be determined "beyond a reasonable doubt" whether

8    "the error complained of did not contribute to the verdict obtained."  Chapman, 386 U.S. at 24.

9            Moreover, a trial judge, as "governor of the trial," Quercia v. United States, 289 U.S. 466,

10   469, 54 S.Ct. 698 (1933), enjoys "wide discretion in the matter of charging the jury."  Charlton v.

11   Kelly, 156 F. 433, 438 (9th Cir. 1907); see also, e.g., Gilbrook v. City of Westminster, 177 F.3d 839,

12   860 (9th Cir. 1999)(trial judges have "substantial latitude in tailoring jury instructions").  This "wide

13   discretion" carries over to a trial judge's response to a question from the jury.  See Allen v. United

14   States, 186 F.2d 439, 444 (9th Cir. 1951)("the giving of additional instructions has always been held

15   to be within the discretion of the trial court").

16           A trial judge has a duty to respond to an inquiry from the jury requesting a clarification.

17   Beardslee v. Woodford, 358 F.3d 560, 574-575 (9th Cir. 2004).  However, while it is true that

18   "[w]hen a jury makes explicit its difficulties" by, for example, asking a question, the trial court

19   "should clear [the jury's difficulties] away with concrete accuracy," Bollenbach v. United States, 326

20   U.S. 607, 612-613, 66 S.Ct. 402 (1946), the precise manner by which the court fulfills this obligation

21   is a matter committed to its discretion.  Wilson v. United States, 422 F.2d 1303, 1304 (9th Cir.

22   1970)("The necessity, extent and character of additional instructions are matters within the sound

23   discretion of the trial court.")  In United States v. Walker, 575 F.2d 209 (9th Cir. 1978), the Ninth

24   Circuit explained the rational behind this broad grant of discretion:

25           We are aware that the trial court faces a difficult task in attempting to respond to a jury's
             communication.  A trial judge is often reluctant to respond to questions in language similar to
26           that used by the jury, particularly where inquiries are phrased as hypothetical cases or as
             questions requiring a categorical yes or no answer.  Questions or illustrations from the jury
27           may be phrased so that a simple affirmative or negative response might favor one party's
             position, place undue weight on certain evidence, or indicate that the trial judge believes
28           certain facts to be true when such matters should properly be determined by the jury.

1    Because the jury may not enlist the court as its partner in the factfinding process, the trial
2    judge must proceed circumspectly in responding to inquiries from the jury. The court may
     properly attempt to avoid intrusion on the jury's deliberations by framing responses in terms
3    of supplemental instructions rather than following precisely the form of question asked by the
     jury.

4    Walker, 575 F.2d at 214.

5        The issue in such cases is whether there is a reasonable likelihood that the jury applied the

6    challenged instruction in a manner that violated the Constitution. Boyde v. California, 494 U.S. 370,

7    380-381, 110 S.Ct. 1190 (1990). To sustain a claim for relief, a petitioner must show (1) that the

8    response was either an incorrect or inaccurate application of state law, (2) that is was a constitutional

9    error, and (3) that the error was not harmless. Estelle, 502 U.S. at 72.

10       C. The Trial Judge's Response Did Not Unconstitutionally Lower The Prosecution's Burden
          of Proof Or Otherwise Violate Petitioner's Constitutional Rights.
11

12       Petitioner contends that the court's response to the jury's question reduced the prosecution's

13   burden of proof, effectively acted as a directed verdict of guilt, and precluded the jury from

14   speculating whether someone else could have fired the fatal shot into the restaurant that killed

15   Donaldson. Petitioner, however, has failed to meet any of the three Estelle requirements for relief.

16       As Respondent correctly points out, the jury was, in essence, seeking guidance on two points:

17   (1) clarification of the felony-murder instruction; and (2) whether the prosecutor was correct in

18   stating that it did not matter who had shot Donaldson. The trial judge clarified the law on felony

19   murder, and also explained that the prosecutor was *not* correct in his assertion that it did not matter

20   who shot Donaldson. In so responding, the trial judge felt it necessary to distinguish between the

21   legal concepts of "provocative act murder" and "felony murder" in order to obviate the possibility

22   that the jury would find Petitioner guilty of murder on a theory that was neither supported by the

23   facts or the law. The trial judge also urged the jurors not to make any determinations based on

24   speculation or conjecture, but to base their findings solely on the evidence presented at trial. Finally,

25   the judge reminded the jurors that they could not find Petitioner guilty unless the evidence convinced

26   them of his guilt beyond a reasonable doubt. None of these admonitions constitute error.

27       Indeed, it is difficult to conceive how any of the aforementioned admonitions could be

28   construed as reducing the prosecution's burden of proof or effectively constituting a directed verdict

of guilt.  The gravamen of Petitioner's argument appears to be that, by emphasizing the need to base

a verdict solely upon the evidence presented at trial, the trial court thereby nullified the possibility

that the jury could find reasonable doubt based on the absence of inculpatory evidence, e.g., a

forensic report that conclusively tied the shot that killed Donaldson to Landois's weapon as opposed

to that of one of the law enforcement officers at the scene.  Such an inverse correlation, however, is

not supported either by the law or logic.[6]

The jurors were thoroughly instructed on the concept of felony murder (Clerk's Transcript on

Appeal ("CT") 1245-1258), the prosecution's burden of proof beyond a reasonable doubt (CT 1200,

1210, 1224), the difference between "evidence" and attorney's comments or questions (CT 1201),

the distinction between circumstantial and direct evidence (CT 1212), the credibility of witnesses

(CT 1202, 1215), and the need to base any findings solely on the evidence and to avoid relying on

speculation and conjecture (CT 1201, 1211).  Petitioner has never objected to the adequacy of these

instructions, nor, indeed, of any of the other instructions included in the original jury charge.  By

emphasizing in his supplement response during deliberations about the need to base any findings on

the evidence presented in court, rather than on sheer speculation or guesswork, the trial judge

correctly stated the law and did not, in any way, imply that reasonable doubt could not be based upon

the absence of evidence of guilt.  The two legal concepts simply do not constitute a "zero-sum"

equation.

In his Traverse, Petitioner argues as follows:

[T]he trial court's supplemental instruction did deny appellant the right to a jury verdict of
guilt beyond a reasonable doubt by improperly suggesting that the prosecution's failure to
persuasively disprove a state of facts consistent with a not guilty verdict under the instruction
given (i.e., that Officer Gauger fired the fatal shot) was an insufficient ground for finding
reasonable doubt, thus lowering the prosecution's burden of proof.  In context and in view of
the record in its entirety, no reasonable juror hearing the trial court's supplemental instruction
could come to any conclusion but that the trial court was instruction them that they must find
that Landois fired the fatal shot because there was no affirming/affirmative evidence that
someone else (i.e., Officer Gauger) did.

---

[6]Specifically, Petitioner argues in his Traverse as follows: "Any reasonable juror could only conclude from the trial
court's response that it was not permitted to conclude that there was a reasonable doubt based on a lack of sufficiently
persuasive evidence concerning a particular fact, because the trial court's response told them that that would be basing a
decision on 'speculation' and not 'evidence.'" (Doc. 23, p. 10).  As discussed infra, Petitioner's attempt to conflate the need
to base jury findings on evidence rather than speculation with the inability to find reasonable doubt from an absence of
evidence is erroneous.

1  (Doc. 23, p. 11).

2        Petitioner's reasoning, however, is based upon a flawed premise.  The record does not

3  contain any evidence whatever that Officer Gauger fired any shots, much less the shot that killed

4  Donaldson.  To the contrary, the evidence established that no officer other than Byerlee fired any

5  shots, and that Byerlee only fired one shot, i.e., the shot that killed Landois.  Although Petitioner,

6  acting pro per at trial, may have hoped to create some kind of doubt in the jurors' minds that,

7  possibly, Donaldson was killed by a bullet other than one fired by his brother, there is simply no

8  evidence to support such a premise.   It is true that the trial court's supplemental instruction, i.e., that

9  a jury finding must be based on evidence and not upon speculation, when followed to its logical

10 conclusion would almost inevitably result in a finding that Landois killed Donaldson, that

11 consequence is not the product of an erroneous trial court instruction, nor indeed any judicial

12 impropriety at trial, but is a result of the strength of the prosecution's evidence of guilt.  As

13 discussed, no evidence was presented to support a finding that Gauger killed Donaldson; therefore,

14 any jury finding that Gauger did kill Donaldson could only be based, necessarily and erroneously, on

15 speculation, not evidence.  Petitioner might have wished that the state of the evidence was otherwise,

16 but wishing does not make it so.  In most criminal prosecutions where the evidence of guilt is quite

17 strong, a proper instruction to the jurors on the need to rely only on the evidence presented to them

18 will produce a guilty verdict, not because the instruction itself is suggestive or improper, but because

19 there is insufficient *exculpatory* evidence, or, to use Petitioner's logic, an insufficient *lack of*

20 *incriminating evidence*, upon which to base a reasonable doubt.  That was the case here.  The fact

21 that the prosecution's case was strong does not in any way suggest that limiting the jurors'

22 consideration to that strong evidence and admonishing them to avoid unfounded speculation was

23 error.

24        In the absence of any response by the trial court that could conceivably be construed as either

25 lowering the prosecution's burden of proof or discounting the ability of jurors to find reasonable

26 doubt based upon the absence of inculpatory evidence, there is no merit to Petitioner's contention.

27        Moreover, the Court agrees with Respondent that, even were that not so, any error would

28 have been harmless since the evidence that Landois's gun killed Donaldson was overwhelming and

the evidence that someone other than Landois killed Donaldson was non-existent.  Nine shell casings were found at the scene of the crime--one Sig .357 casing and eight Winchester nine-millimeter casings.  The former was traced to Byerlee's service revolver, and it was undisputed that Byerlee fired only one shot at Landois, striking him in the head.  The eight Winchester casings were found in close proximity to Landois, all appeared to have come from his weapon, and, when Landois was shooting at Byerlee, he had been firing in the general direction of the Arby's restaurant where Donaldson was eating with his family.  Moreover, it was undisputed that no other officer at the scene fired a weapon.  Although no forensic tests were conducted that conclusively linked the shot that killed Donaldson to Landois's gun, a forensic report indicates that a Glock fired from Landois's position would have been able to penetrate the wall at the Arby's restaurant with sufficient velocity to hit Donaldson.  Thus, the evidence overwhelmingly supports a finding beyond a reasonable doubt that Landois fired the shot that killed Donaldson.

Under such circumstances, even if the trial judge's response could be considered error, given the overwhelming evidence that Landois shot Donaldson, any error would not have had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 638, 113 S.Ct. 1710 (1993).  Accordingly, the error, if any, was harmless.

In sum, the state court adjudication was neither contrary to nor an unreasonable application of clearly established federal law.  Therefore, the claim should be rejected on its merits.

**Ground Three            Insufficient evidence was presented to support a finding that Petitioner acted with the intent to kill or with reckless disregard for human life.**

Petitioner does not directly challenge his conviction for first degree felony murder, but rather contends that the evidence was insufficient to prove the special allegation that he had the requisite intent to kill or reckless disregard for human life required to sentence him to life without the possibility of parole.   This contention is also without merit.

A. Standard of Review For Sufficiency of the Evidence.

The law on sufficiency of the evidence is clearly established by the United States Supreme Court.  The Due Process Clause "protects the accused against conviction except upon proof beyond a

reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068 (1970). Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781 (1979), the test on habeas review to determine whether a factual finding is fairly supported by the record is as follows:

> "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781, 110 S.Ct. 3092 (1990). Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.[7]

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.'" See id., quoting Jackson, 443 U.S. at 319. Only where no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted. See Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. A jury's credibility determinations are therefore entitled to near-total deference. Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004). Except in the most exceptional of circumstances, Jackson does not permit a federal court to revisit credibility determinations. See id. at 957-958.

Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995). However, mere suspicion and speculation cannot support logical inferences. Id.; see, e.g., Juan H. v. Allen, 408 F.3d 1262, 1278-

---

[7] In reviewing sufficiency of evidence claims, California courts expressly follow the standard enunciated in Jackson. See People v. Johnson, 26 Cal.3d 557, 575-578 (1980); see also People v. Thomas, 2 Cal.4th 489, 513 (1992).

1   1279 (9th Cir. 2005)(only speculation supported conviction for first degree murder under theory of

2   aiding and abetting).

3        After AEDPA, a federal habeas court must apply the standards of <u>Jackson</u> with an additional

4   layer of deference.  <u>Juan H.</u>, 408 F.3d at 1274.  Generally, a federal habeas court must ask whether

5   the operative state court decision reflected an unreasonable application of <u>Jackson</u> and <u>Winship</u> to

6   the facts of the case.  <u>Id.</u> at 1275.[8]

7        Moreover, in applying the AEDPA's deferential standard of review, this Court must also

8   presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); <u>Kuhlmann v.</u>

9   <u>Wilson</u>, 477 U.S. 436, 459, 106 S.Ct. 2616 (1986).  This presumption of correctness applies to state

10  appellate determinations of fact as well as those of the state trial courts.  <u>Tinsley v. Borg</u>, 895 F.2d

11  520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply to state court

12  determinations of legal questions or mixed questions of law and fact, the facts as found by the state

13  court underlying those determinations are entitled to the presumption.  <u>Sumner v. Mata</u>, 455 U.S.

14  539, 597, 102 S.Ct. 1198 (1981).

15       B.  <u>California's First Degree Murder Special Allegation</u>.

16       Under California law, a criminal defendant is subject to the sentence of death or life

17  imprisonment without possibility of parole if the jury finds true the special circumstance that the first

18  degree murder "was committed while the defendant was engaged in, or was an accomplice in, the

19  commission of, attempted commission of, or the immediate flight after committing, or attempting to

20  commit" certain enumerate felonies, including robbery and second degree burglary. (Cal. Pen. Code

21  § 190.2(a)(17)(A), (a)(17)(G).)  A felony-murder special circumstance is applicable to an aider and

22  abettor who is not the actual killer if the prosecution shows the aider and abettor either had the

23  "intent to kill" or acted with reckless indifference to human life and as a major participant in the

24  underlying felony.  (Cal. Pen. Code § 190.2( c), (d).)

25       In its decision, the 5th DCA correctly observed that, at trial, the robbery/murder special

26

27       [8]Prior to <u>Juan H.</u>, the Ninth Circuit had expressly left open the question of whether 28 U.S.C. 2254(d) requires an additional degree of deference to a state court's resolution of sufficiency of the evidence claims.  See <u>Chein v. Shumsky</u>, 373

28  F.3d 978, 983 (9th Cir. 2004); <u>Garcia v. Carey</u>, 395 F.3d 1099, 1102 (9th Cir. 2005).

1   circumstance was not based upon proof of Petitioner's intent to kill, but instead upon the language of

2   California Penal Code §190.2(d), which states as follows:

> "[E]very person, not the actual killer, who, *with reckless indifference to human life and as a major participant*, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraphs (1) of subdivision (a) which results in the death of a some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true."

7   (LD 4, p. 39)(Emphasis in original).

8       The italicized qualifier in §190.2(d) is based upon the United States Supreme Court's ruling

9   in Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676 (1987).  Tison involved two brothers sentenced to

10  death for assisting their inmate father and another inmate in escaping from prison, where the father

11  and the other inmate then killed a family of four to obtain their vehicle while the two brothers

12  watched.  The U.S. Supreme Court held that the death penalty may be constitutionally imposed under

13  the Eighth and Fourteenth Amendments on an accomplice to a felony-murder where there was

14  "major participation in the felony committed, combined with reckless indifference to human life."

15  Tison, 481 U.S. at 157-158.  The California Legislature drafted § 190.2(d) specifically to conform to

16  Tison's Eighth Amendment requirements.  People v. Estrada, 11 Cal.4th 568, 575-576 (1995);

17  People v. Proby, 60 Cal. App.4th 922, 927-928 (1998).  Because "Tison is the source of the language

18  of section 190.2(d)...the constitutional standards set forth in that opinion are therefore applicable to

19  all allegations of a felony-murder special circumstance [under California law] regardless of whether

20  the People seek and exact the death penalty or a sentence of life without parole."  Estrada, 11 Cal.4th

21  at 575-576.

22      In Tison, the Supreme Court explained the "reckless disregard" element, the only element at

23  issue in this proceeding, as follows:

> A narrow focus on the question of whether or not a given defendant "intended to kill," however, is a highly unsatisfactory means of definitively distinguishing the most culpable and dangerous of murderers.  Many who intend to, and do, kill are not criminally liable at all–those who act in self-defense or with other justification or excuse.  Other intentional homicides, though criminal, are often felt undeserving of the death penalty–those that are the result of provocation.  On the other hand, some nonintentional murderers may be among the most dangerous and inhumane of all–the person who tortures another not caring whether the victim lives or dies, *or the robber who shoots someone in the course of the robbery, utterly*

1

> *indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property. The reckless indifference to the value of human life may be every bit as shocking to the moral sense as an "intent to kill."* Indeed it is for this very reason that the common law and modern criminal codes alike have classified behavior such as occurred in this case along with intentional murders. Enmund [v. Florida, 458 U.S. 782, 102 S.Ct. 3368 (1982)] held that when "intent to kill" results in its logical though not inevitable consequence–the taking of human life–the Eighth Amendment permits the State to exact the death penalty after a careful weighing of the aggravating and mitigating circumstances. Similarly, we hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

Tison, 481 U.S. at 157-158. (Emphasis supplied).

Under California law, the "culpable mental state of 'reckless indifference to life' is one in which the defendant 'knowingly engag[es] in criminal activities known to carry a grave risk of death'." Estrada, 11 Cal.4th at 577. This appears to be a fair and straightforward application of the standard articulated by the Supreme Court in Tison. See Tison, 481 U.S. at 157.

The Tison court further explained the distinction between the terms "major participant" and "reckless indifference" as follows:

> Although we state these two requirements separately, they often overlap. For example, we do not doubt that there are some felonies as to which one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of human life. Moreover, even in cases where the fact that the defendant was a major participant in a felony did not suffice to establish reckless indifference, that fact would still often provide significant support for such a finding.

Tison, 481 U.S. at 158, fn. 12.

C. Sufficient Evidence Was Presented Regarding Intent To Kill Or Reckless Disregard For Human Life.

After a thorough discussion of the Tison requirements as applied under California law by Estrada, the 5th DCA concluded that substantial evidence supported the special allegation. (LD 4, p. 44), as follows:

> The two men planned to commit identical armed robberies in adjoining clothing stores, around noontime in a crowded shopping center. Defendant pulled his gun on the Clothestime clerk and ordered her to give him the money or he would blow her away. As he left the store, defendant told the clerk and the customer that he could come back and kill them if they got up. Landois entered Susie's with a loaded Glock handgun. Defendant was later found in possession of a matching stolen Glock, which was also loaded, and a box of ammunition that was almost half empty.

1

2   Defendant ran out of Clothestime and reach the van while Landois was still inside Susie's.
    Defendant looked back toward the stores, which might have indicated his concern that
    Landois was still inside Susie's, even though defendant was ready to leave.  Defendant had
    the opportunity to escape in the van, but he decided to linger in the parking lot and wait for

3   Landois to emerge from Susie's, even though a Highway Patrol car parked next to the stolen
    van.  An employee of another store saw Landois running through the parking lot and openly

4   holding his gun.

5   The deployment of a gun in a criminal endeavor magnifies the risk that someone will be
    seriously injured or killed.  Defendant intentionally delayed his escape until he met the armed

6   and obviously frantic Landois somewhere in the crowded parking lot, as three uniformed
    police officers walked through the area as if they were "on a mission."  Since deployment of

7   a gun magnifies the risk of death, the jury herein was not required to draw the factually
    unsupported and inherently improbable conclusion that defendant was unaware of the risks

8   unless he hear and/or witnessed the gunshots fired by Landois.  Instead, the jury could
    reasonably deduce from the evidence that defendant was sufficient aware of the risks posed

9   by committing armed robberies in a busy shopping center at noontime, and that defendant
    acted with reckless indifference to human life by waiting for the armed and obviously frantic

10  Landois to leave Susie's, get into the Buick, and follow defendant's van as they drove past
    the three police officers.

11

12  (LD 4, pp. 45-46).

13       The state court then addressed Petitioner's contention that "reckless indifference" can only be

14  shown if the nonkiller is physically present during the murder and that therefore there is insufficient

15  evidence to support the jury's "reckless indifference" finding in this case because none of the

16  witnesses saw defendant or the van at the precise moment that Landois opened fire in the parking lot:

17  Defendant's argument is based upon a series of cases which found substantial evidence to
    support the "reckless indifference" aspect of the first degree felon-murder special

18  circumstance for a nonkilling accomplice, in situations where the nonkiller was either
    physically present or could hear the acts which resulted in the murder...

19
    ...
20
    Defendant contends that in contrast to Tison and the other cases, he was not physically

21  present when Landois started started shooting in the parking lot, none of the officers or
    witnesses saw the gray van in the vicinity of the gunfight, and his absence negates any

22  inference that he showed reckless indifference to human life since he was trying to escape
    from the scene and may have even left the parking lot.

23
    However, neither Tison nor section 190.2, subdivision (d) requires the nonkilling accomplice

24  to be physically present or have some sensory or auditory perception that a murder is being
    committed.  As we have already explained, defendant intentionally delayed his departure

25  from the parking lot until the armed Landois reached the Buick.  "Participants in violent
    felonies like armed robberies can frequently 'anticipat[e] that lethal force...might be used...in

26  accomplishing the underlying felony.'" (Tison, supra, 481 U.S. at pp. 150-151.)
    "[Defendant] had to be aware [that] use of a gun to effect the robbery presented a grave risk

27  of death." (People v. Hodgson, 111 Cal. App.4th 566, 580 (2003).)  Defendant's van was
    just in front of the Buick and the jury could have found that he gained a "'subjective

28  awareness of a grave risk to human life'" as shots were fired behind him into a crowded

1    parking lot.  (People v. Smith, 135 Cal.App.4th 914, 927 (2005).)[9]

2        We thus conclude the jury's true finding on the special circumstance for a nonkilling
         accomplice is supported by substantial evidence that defendant acted with reckless
3        indifference to human life and as a major participant in the commission of the underlying
         armed robberies.

4

5    (LD 4, pp. 46-48).

6        As he did in the 5th DCA, Petitioner here contends that insufficient evidence of a "reckless

7    disregard" for human life was presented.  Petitioner does not challenge the allegation as it relates to

8    whether Petitioner was a "major participant" in the commission of the robberies, but only whether he

9    acted with reckless indifference to human life.  (Doc. 23, p. 14).  Petitioner argues that neither the

10   state court nor Respondent have cited a single precedent that is factually on point with this case, and,

11   further, that the evidence at trial did not establish that he was "subjectively aware" that his actions

12   were likely to result in the taking of innocent life.  (Id., p. 15).

13       As discussed in the previous section, however, under both California law and Tison, reckless

14   disregard for human life is a mental state implicit in knowingly engaging in criminal activities known

15   to carry a grave risk of death represents a highly culpable mental state.  Tison, 481 U.S. at 157-158.

16   In this respect, the 5th DCA correctly applied the appropriate standard under Tison and, after a full

17   and thoughtful analysis, concluded that Petitioner acted with the requisite mental state.

18       While evidence of Petitioner's proximity, or lack thereof, to Landois at the time when the

19   fatal shot that killed Donaldson was fired could be one circumstance among many that a jury might

20   consider in deciding the truth of the special circumstance allegation, as the 5th DCA noted, nothing in

21   either Tison or the other cases discussed by the state court requires such proximity as a sine qua non

22   of the mental state of "reckless disregard."  The state court found that, based on the trial record,

23   Petitioner chose to remain in the vicinity of the robberies, presumably in order to leave with his

24   brother, Landois when they eventually made their escape.  Considering the violent nature of the

25   robberies themselves, the inherent potential for the use of lethal force, the possession of loaded

26   weapons by both Landois and Petitioner, their use of those weapons in conjunction with threats of

27

28
         ─────────────
         [9]Overruled on other grounds in People v. Garcia, 168 Cal.App.4th 261, 291 (2008).

1   death to cow their victims and to further their criminal enterprise, the obvious coordination of their

2   actions by arriving in separate vehicles and simultaneously robbing adjacent stores, the crowded

3   nature of this particular shopping mall at lunchtime, the intervening presence of armed police

4   officers already alerted to the robberies, and the fact that something untoward and unplanned had

5   obviously happened to Landois that delayed his departure, thus adding to the potential for a conflict

6   between the robbers and law enforcement officers, Petitioner's decision to remain in the area with

7   his loaded gun, presumably in order to aid and assist his brother if need be, can only be characterized

8   as exhibiting a reckless disregard for human life.  The potential for a lethal outcome was implicit in

9   the circumstances described above, and Petitioner, by his active participation in those circumstances,

10  exhibited a subjective awareness of that potential for a lethal outcome.

11      Given this Court's need to afford the state court the additional layer of deference required by

12  Juan H., 408 F.3d at 1274, and also to presume the correctness of the state court's factual findings

13  under 28 U.S.C. § 2254(e)(1), the Court finds Petitioner's contention that the evidence of his

14  reckless indifference was constitutionally deficient to be wholly unpersuasive.  Under Juan H., the

15  AEDPA only requires that this Court decide whether the 5th DCA's decision was contrary to or an

16  unreasonable application of clearly established federal law, i.e., whether the adjudication of

17  sufficient evidence under Jackson was objectively unreasonable or whether "fairminded jurists"

18  could disagree about the conclusion.  Wiggins v. Smith, 539 U.S. at 511; Harrington, 562 U.S. ___ ,

19  131 S.Ct. 1388.   For the reasons discussed above, the Court concludes that the state court's

20  adjudication was objectively reasonable.  Therefore, this claim should be denied.

21                      **RECOMMENDATION**

22      Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus

23  (Doc. 1), be DENIED with prejudice.

24      This Findings and Recommendation is submitted to the United States District Court Judge

25  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

26  Local Rules of Practice for the United States District Court, Eastern District of California.  Within

27  twenty (20) days after being served with a copy of this Findings and Recommendation, any party

28  may file written objections with the Court and serve a copy on all parties.  Such a document should

1   be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the

2   Objections shall be served and filed within ten (10) court days (plus three days if served by mail)

3   after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to

4   28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified

5   time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153

6   (9th Cir. 1991).

7

8   IT IS SO ORDERED.

9   Dated:   **February 26, 2012**                         **/s/ Jennifer L. Thurston**
                                                      UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28